UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Case No. |
| v. | ) | 17-CR-73-JMH |
| | ) | |
| ARROW-MED AMBULANCE, INC., et | ) | |
| al., | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendants. | | |

\*\*\*

This matter is before the Court upon the United States'
*Daubert* Motion to Exclude Expert Witness Testimony [DE 83], in
which the United States moves to exclude testimony from
Defendants' noticed expert witness, Larry Joe Russell, M.D.,
C.M.D, pursuant to Federal Rule of Evidence 702, *Daubert v.
Merrell-Dow Pharma, Inc.*, 509 U.S. 579 (1993), and *Kuhmo Tire
Co. v. Carmichael*, 526 U.S. 137 (1999).

The United States takes the position that his proposed
testimony that it was "reasonable" for the Defendants to seek
payment from Medicare or Medicaid for certain ambulance
transports, and that there "was not sufficient reason for Arrow-
Med to contradict the information" contained in Physician
Certification Statements, is inadmissible for multiple reasons.
Specifically, the United States argues that his proposed
testimony (1) directly contradicts the federal regulation

1

governing Medicare's coverage of non-emergency ambulance transports, and (2) is tantamount to an opinion on the Defendants' intent to commit health care fraud prohibited by Rule 704(b).

## I.

On January 18, 2018, counsel for Defendant Arrow-Med Ambulance, Inc. and Jay Arrowood produced the report and curriculum vitae of Larry J. Russell, M.D., pursuant to Rule 16. *See* Exhibit 2. Dr. Russell is a professional expert witness, testifying in as many as a dozen lawsuits a year. Ex. 2 at 20-21. It is unclear how many of those cases, if any, involve ambulance transport. Dr. Russell's core opinion as to each of the claims at issue in Counts 2 through 15 of the Indictment is that "it was reasonable for Arrow-Med to seek payment from Medicare [or Medicaid] for the transport" because Arrow-Med possessed a PCS form signed by a physician. Ex. 2 at 5-10. Additionally, he opines "there was not sufficient reason for Arrow-Med to contradict the information in the Physician Certification Statements for Ambulance Transportation for each of the patients" at issue in the Indictment. *Id.* at 11. He also offers general opinions on dialysis treatment and the need for ambulance service to and from such treatment; on his interpretation of Medicare regulations; on the records and information Arrow-Med would have had access to; and the quality

of the government's expert witness' opinion. *Id.* at 10-11 ("Additional Observations and Opinions"). The materials Dr. Russell used in forming his opinions are set out at page 2 of his report; this list does not specifically identify the medical records he reviewed.

**II.**

Federal Rule of Evidence 702 allows for the admission of relevant expert testimony helpful to the jury if a witness "qualified as an expert by knowledge, skill, experience, training or education" provides testimony that (1) is based on sufficient facts or data, (2) is the product of reliable principles and methods, and (3) reflects reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. As an initial matter, whether an expert is qualified to testify is a "separate but related inquiry" wherein the proponent of the expert must establish those factors relating to the expert's "background that makes his knowledge 'specialized,' that is, beyond the scope of the ordinary juror." *See Zuzula v. ABB Power T & D Co., Inc.,* 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003). "The qualification . . . must match up with the subject matter about which the expert is to testify." *Elswick v. Nichols*, 144 F. Supp. 2d 758, 766 (E.D. Ky. 2001) ("before the expert is found qualified to offer an opinion about a particular issue, the court must also decide whether the actual

qualifications of the expert enable him or her to assist the trier of fact with regard to each controverted issue about which the expert seeks to testify") (quoting Moore's Federal Practice, Reference Manual on Scientific Evidence 58 (Matthew Bender ed., 1995)). The Court must determine whether the witness is properly qualified to opine on the subject at hand by looking to the witness's "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

The "knowledge" prerequisite in Rule 702 requires "more than subjective belief or unsupported speculation." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 590). In its inquiry, the Court should not look to "the qualifications of a witness in the abstract, but [to] whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). *Kumho* emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 526 U.S. at 157 (quotation and citation omitted).

Next, the Supreme Court requires that expert testimony must be both relevant and reliable. *See Daubert*, 509 U.S. at 591-92. Expert testimony is relevant when it will assist the trier of fact to understand or determine a fact issue. Rule 702 requires

the district court to perform a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In *Daubert*, the Court identified a number of factors that may bear upon the reliability of an expert's testimony, including whether the expert's theory or technique can be or has been tested; whether the theory or technique has been subjected to peer review and publication; whether the theory or technique has a high known or potential error rate; and whether the theory or technique enjoys general acceptance. *Id*. at 593-94. "Proposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Elswick*, 144 F. Supp. 2d at 766 (quoting *Daubert*, 509 U.S. at 588).

When the proffered expert testimony is not scientific in nature, the district court is to be guided by the ultimate purpose of *Daubert* and is not to be restricted to a rigid application of the factors outlined in that decision. *See Kumho*, 526 U.S. at 152. When such expert witness testimony is proffered, the court's task is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* To determine whether an expert is sufficiently reliable to testify, the court must assess "whether

the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *See United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (quoting *Daubert*, 509 U.S. at 592-93).

Finally, while the Defendants may solicit opinion testimony relevant to the question of a defendant's "specific intent to deceive or defraud," *United States v. White*, 492 F.3d 380, 394 (6th Cir. 2007), *see also* 18 U.S.C. § 1347 (requiring that violations of the statute be made "knowingly and willfully"), Rule 704 prohibits an expert witness from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). Those decisions "are for the trier of fact alone." *Id.* "Rule 704 prohibits testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *United States v. Watson*, 260 F.3d 301, 309 (3d Cir. 2001) (internal quotations and citations omitted); *see also Powell v. Tosh*, 942 F. Supp. 2d 678, 703 (W.D. Ky. 2013) ("A party's state of mind . . . is not within the knowledge of any expert.") (internal quotations and citations omitted).

Dr. Russell's proffered testimony is grounded in two central and related opinions. First, according to Dr. Russell, Arrow-Med's possession of PCS forms signed by a doctor made it reasonable for Arrow-Med to seek payment from Medicare or Medicaid for the ambulance transports at issue in the Indictment. *See*, *e.g.*, Ex. 2 at 6 ("Because Dr. Agomaa certified that the ambulance transport of Mr. Noble was medically necessary, it is my opinion that it was reasonable for Arrow-Med to seek payment from Medicare for that transport."). Second, Dr. Russell would testify that because Arrow-Med possessed the signed PCS forms, "there was not a sufficient reason for Arrow-Med to contradict the information contained in [the PCS forms] in any of its run sheets." *Id.* at 6-7. These opinions are unreliable because they conflict with the controlling regulation, which states that the physician's certification does not establish medical necessity, and that the medical necessity criteria must be met independent of any piece of paper signed by a doctor. *See* 42 C.F.R. § 410.40(d)(3)(v); Medicare Benefit Policy Manual Ch. 10, § 10.2.1.

The controlling regulation clearly states that "[t]he presence of the signed certification statement . . . does not alone demonstrate that the ambulance transport was medically necessary. All other program criteria must be met in order for

payment to be made." 42 C.F.R. § 410.40(d)(3)(v). Chapter 10 of the Medicare Benefit Policy Manual, on which Dr. Russell claims to have based his opinion, likewise instructs that the presence of a signed physician's order for ambulance transport does not prove that the transport was necessary. Medicare Benefit Policy Manual Ch. 10, § 10.2.1. The Sixth Circuit has rejected the same argument the Defendants are attempting to make through Dr. Russell, namely that a signed PCS is sufficient evidence of medical necessity and thus a reasonable basis for an ambulance provider to demand payment from Medicare, regardless of the falsifications the ambulance provider makes to its run sheets. *See United States v. Medlock*, 792 F.3d 700, 709 (6th Cir. 2015) (". . . [I]f a CMN was all that was required to determine medical necessity, then the part of the regulation [42 C.F.R. § 410.40(d)(2)] that required run sheets would be redundant. We choose to give effect to every word of the regulation. Second, the run-sheet process allows review of 'the Medicare payment decision [that would otherwise be] left in the hands of a random doctor whose interest may be far from the integrity of the Medicare program....'").

The Court agrees with the United States that Dr. Russell's primary opinion ignores and contradicts this authority and is therefore, unreliable. Medicare pays only for medically necessary services, and it simply cannot be "reasonable" for

8

Arrow-Med – or any ambulance company – to predicate its decision to demand payment from Medicare solely on a signed PCS form when the applicable regulation, program guidance, and controlling case law all state that the signed PCS does not establish medical necessity. Dr. Russell's corollary opinion about Arrow-Med having no reason to "contradict" the PCS form is unreliable for the same reason. If Medicare has specified that the signed PCS form does not alone establish medical necessity, then ambulance providers like Arrow-Med must look beyond the piece of paper for information about the patients that support – or refute – medical necessity before seeking payment from this federal health care program.

Because Dr. Russell's primary opinions conflict with the controlling law and program guidance, they are unreliable and will only serve to confuse the jury. *See United States v. Gallion*, 257 F.R.D. 141, 156 (E.D. Ky. 2009) (excluding expert opinion that included "incorrect statements of the law and, therefore . . . are inadmissible"). They should be excluded.

**IV.**

Dr. Russell, in claiming that what Arrow-Med did was "reasonable," is trying to testify to the Defendants' state of mind. Rule 704(b) forbids "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid.

704(b). While Dr. Russell's opinion does not explicitly state "the Defendants did not have the intent to defraud," his opinion that they acted "reasonably" leads inevitably to that conclusion; a health care provider who acts reasonably in its Medicare billing cannot simultaneously be acting with an intent to defraud. Such an opinion is inappropriate expert testimony under Rule 704. *See Watson*, 260 F.3d at 309 ("Rule 704 prohibits testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea.").

Indeed, this Court has rejected past efforts by defense experts to "express stealth opinions regarding ultimate issues of the defendant's intent and the willfulness of his conduct." *United States v. Lawrence*, No. 2:11-cr-52-DCR, 2012 WL 2175760 at *4 (E.D. Ky. June 14, 2012). In *Lawrence*, which concerned the prosecution of a lawyer for tax fraud, the Court invoked Rule 704 to prohibit a CPA from testifying that "it is *reasonable* for a lawyer to expect that his CPA, when preparing the tax returns, will review all records of the lawyer needed to prepare and file accurate returns . . . ." *Id.* at *3 (emphasis added). Dr. Russell's opinion is remarkably similar to the "stealth opinion" excluded in *Lawrence* – it is reasonable for the defendant (whether ambulance company or lawyer) to expect that a third party (whether doctor or CPA) will prepare paperwork needed by

10

the defendant in an accurate and complete manner (whether PCS forms or tax returns). If this opinion testimony were credited, the jury would be forced to conclude that the defendant did not act with intent to defraud, and it is therefore prohibited by Rule 704. *See Watson*, 260 F.3d at 309-10 ("The defendant's intent is an ultimate issue of fact that the jury alone must decide.").

Sixth Circuit law also prohibits expert witnesses from reaching legal conclusions in their testimony or from telling jurors what result to reach on the ultimate issues in a case. *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994); *Summerland v. Cty. of Livingston*, 240 F. App'x 70, 81 (6th Cir. 2007) (affirming exclusion of expert opinion that "reasonable" force was not used as inadmissible legal conclusion). Telling jurors defendants acted "reasonably" is precisely such inadmissible expert testimony. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("[T]estimony offering nothing more than a legal conclusion – i.e, testimony that does little more than tell the jury what result to reach – is properly excludable under the Rules."); *see also James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC.*, No. 5:11-CV-374-DCR, 2014 WL 1664263, at *5 (E.D. Ky. Apr. 25, 2014) (excluding testimony of certified public accountant "attempting to express improper legal opinions concerning the interpretation and effect of

several contracts" as well any discussion of conduct as "improper or schemes"). This limitation is critical because "[i]f an expert's opinion tells the jury what result to reach it usurps the role of the jury and is inadmissible." *James T. Scatuorchio Racing Stable*, No. 5:11-374-DCR, 2014 WL 1664263, at *5. Testimony that the Defendants acted reasonably when falsifying records and transporting individuals who could walk to the ambulance directly contravenes Rule 704(b)'s prohibition on opinions regarding a defendant's intent.

Likewise, Dr. Russell's opinion that Arrow-Med did not have "sufficient reason to contradict" the information in the PCS forms is inadmissible testimony about a defendant's mental state. *Tosh*, 942 F. Supp. 2d at 703 ("A party's state of mind . . . is not within the knowledge of any expert."). There is ample evidence that Arrow-Med EMTs and paramedics notified the Defendants that many of the dialysis patients were ambulatory and did not require an ambulance on a regular basis; rather than determine whether there was merit to the EMTs' and paramedics' concerns, the Defendants instructed them to prepare their run sheets to indicate medical necessity and billed Medicare for the services anyway. Whether Dr. Russell ignored this evidence or Defendants did not provide it to him, he cannot testify to whether the concerns were a sufficient reason in Defendants' minds to look beyond the signed PCS forms.

**V.**

Finally, while the Court need not decide this issue, the undersigned observes and agrees with the United States that Dr. Russell's opinions on the Medicare regulations are not adequately supported by his experience. *See* Exhibit 2 at 11. Although a medical doctor, he is not a Medicare regulations expert. *Id.* at 15-18. This is belied by his opinion that is directly contradicted by the statutes themselves. Dr. Russell opines that Arrow-Med had no reason to "contradict" the PCS forms, and they were justified in simply relying on those forms for medically necessity. *Id.* at 3. The regulations state the exact opposite: "The presence of the signed physician certification statement does not alone demonstrate that the ambulance transport was medically necessary." 42 C.F.R. § 410.40(d). He then claims – without any identifiable basis or explanation – that the reference in the regulation to "all other program criteria" being met is a technicality relating to the "vehicle requirements." *Id.* at 11. Dr. Russell is not qualified to testify as an expert on Medicare regulations, particularly when he does not accurately state those regulations. Medicare experts are frequently permitted to testify about Medicare rules, "as long as the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case." *United States v. Davis*, 471 F.3d 783, 788-89 (7th Cir. 2006). He

may qualify as an expert on ambulance transport, but he is not an expert on Medicare regulations. To be admissible, an expert's qualifications "must match up with the subject matter about which the expert is to testify." *Elswick*, 144 F. Supp. 2d at 766.

**VI.**

Defendants argue that evidence should only be excluded where it "is clearly inadmissible on all potential grounds." *Gresh v. Waste Servs. of America, Inc.*, 738 F.Supp.2d 702, 706 (E.D.Ky. 2010) (internal citations and quotations marks omitted), and that "rejection of expert testimony is the exception rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted). In this instance, there is sufficient legal basis to exclude the proposed testimony of Dr. Russell as described above.

Accordingly, **IT IS ORDERED**:

(1) that the United States' *Daubert* Motion to Exclude Expert Witness Testimony [DE 83] is **GRANTED**

(2) that Dr. Russell's proposed testimony that it was "reasonable" for the Defendants to seek payment from Medicare or Medicaid for certain ambulance transports, and that there "was not sufficient reason for Arrow-Med to contradict the information" contained in Physician Certification Statements, is **EXCLUDED**.

This the 20th day of April, 2018.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge